UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC. | CIVIL ACTION |
| VERSUS | NO. 05-6480-EEF-SS |
| MURPHY OIL USA, INC. | |

REPORT AND RECOMMENDATION

On December 13, 2005, the plaintiff, American Steamship Owners Mutual Protection and Indemnity Association, Inc. ("American Club"), filed a complaint for declaratory judgment against the defendant, Murphy Oil USA, Inc. ("Murphy"). American Club seeks a declaration of the amount of the reasonable and necessary attorney's fees and costs that it is obligated to pay pursuant to a Contract of Affreightment. Rec. doc. 1. Murphy answered and filed a counterclaim against American Club and a third party complaint against Mid-Stream Fuel Services, L.L.C. and Mid-Stream Holding Corporation (collectively referred to as "Mid-Stream"). Murphy seeks dismissal of American Club's claims and a judgment against American Club and Mid-Stream for attorney's fees, costs and penalties as provided by Louisiana law.

Murphy's request for summary judgment was denied. Rec. doc. 28. Thereafter, the action was referred to the undersigned to hear and determine the issues. Rec. doc. 32. A trial was conducted on July 23, 2007. For the reasons described below, it is recommended that, pursuant to

the Contract of Affreighment, Mid-Stream and American Club be assessed $30,487.56, as the reasonable and necessary attorney's fees and costs incurred by Murphy.

<u>BACKGROUND OF THE DISPUTE</u>

American Club is the insurer of Mid-Stream. Murphy and Tenn-Tom Towing Co., a division of Mid-Stream ("Tenn-Tom"), entered into a Contract of Affreighment dated April 1, 1997 which was amended effective April 1, 2002 (hereafter the Contract of Affreighment, as amended, is referred to as the "Contract"). At all times pertinent the Contract was in force and effect.

Pursuant to the Contract, Murphy, as shipper, agreed to tender to Mid-Stream, as carrier, petroleum products which Mid-Stream was required to transport to certain terminals. Mid-Stream agreed to provide sufficient and proper equipment for performance of the transportation of the petroleum products with fully qualified, experienced and, where necessary, certified and licensed personnel to operate the equipment.

Pursuant to paragraph 9(b) of the Contract, Mid-Stream agreed to procure, pay for and maintain certain insurance coverages, naming Murphy as additional assured with waivers of subrogation against Murphy, including protection and indemnity or marine liability insurance.

The Contract (paragraph 12) further provided that, subject to the conditions with respect to insurance,

> Carrier [Mid-Stream] shall indemnify, defend and save harmless Shipper [Murphy] of and from all claims, charges and expenses, including reasonable attorney's fees, for damages to third parties arising from injuries to or death of any person or damage to property caused by negligence on the part of the Carrier in the performance of its obligations under this Agreement, and from all liabilities imposed on the vessel or owner by statute or otherwise on the carriage of products covered by this Agreement.

2

Exhibit P-1 at p. 11.

Pursuant to the Contract, Mid-Stream provided the push boat M/V JEANIE G to move the tank barge TTT-320 from Murphy's refinery in Meraux, Louisiana to St. Marks, Florida.  Murphy had no involvement with the M/V JEANIE G's navigation or operation.

On December 2, 2003, the M/V JEANIE G with barge TTT-320 in tow was traveling east in the Intracoastal Waterway through the Mobile Ship Channel when she collided with the M/V OCEAN PRIDE.  A crew member of the M/V JEANIE G, Eric Blackwell, allegedly suffered personal injuries as a result of the collision and filed suit in June, 2004 against Mid-Stream in the proceeding "Eric Blackwell v. Mid-Stream Fuel Service, L.L.C./Mid-Stream Holding Corporation," Civil Action No. 04-1686, Section "L", United States District Court for the Eastern District of Louisiana (the "Blackwell case").

The captain of the M/V JEANIE G, Carl Binder, allegedly suffered personal injuries as a result of the collision and filed suit in July, 2004 against Mid-Stream in the proceeding "Carl Binder v. Mid-Stream Holding Corporation and Ocean Longevity Shipping and Management Company, Ltd.," Civil Action No. 04-1930, Section "L", United States District Court for the Eastern District of Louisiana (the "Binder case").[1]

On January 25, 2005, supplemental and amending complaints were filed in both the Blackwell and Binder actions naming Murphy as an additional defendant and alleging it was the

---

[1] Captain Binder's name in these proceedings is frequently spelled "Bender."  At the trial of this action counsel for the parties reported that the proper spelling is "Binder."

charterer of the M/V JEANIE G and liable to the plaintiffs along with the other defendants.[2]

On February 1, 2005, Murphy was served with the amended complaint in the Blackwell case. On February 3, 2006, it was served with the amended complaint in the Binder case.  On February 7, 2005, Murphy assigned its defense of the Blackwell case to Michael McGlone, who was a partner at the law firm of Lemle & Kelleher, L.L.P.  On February 16, 2005, Murphy assigned its defense of the Binder case to McGlone.  Prior to service of the amended complaints, neither Murphy nor its counsel had any notice of the Blackwell and Binder case.

When Murphy was added as a defendant in the two action, the Blackwell case was set for jury trial on June 6, 2005 and the Binder case was set for jury trial on  July 25, 2005.

COMMUNICATIONS BETWEEN COUNSEL

On February 14, 2005, McGlone sought file material from Robert Killeen, counsel for Mid-Stream, and Darleen Jacobs, counsel for the plaintiffs.  Both counsel requested that McGlone not move for a continuance of the trial dates.

McGlone asked Jacobs for a copy of the alleged charter, but she did not provide it.  He testified that he also asked Killeen to provide a copy of the charter, but he did not provide it either. McGlone also asked Murphy to provide a copy of the charter.  By the middle of March 2004, Murphy supplied McGlone with a copy of the Contract.  The first reference to the Contract in the

---

[2]  On December 17, 2004, Blackwell and Binder filed identical motions to extend the deadline for the amendment of pleadings.  They reported that, on September 23, 2004, Mid-Stream was asked in written discovery to provide the name of the charterer of the M/V JEANIE G.  At a telephone discovery conference on December 16, 2004, Mid-Stream advised that the charterer was one of the "Murphy Companies."  It promised to respond with the proper name within a week.

Lemle billing records is Tuesday, March 15, 2005.[3]

This dispute regarding the defense and indemnity of Murphy revolves around the involvement of McGlone and Killeen and a series of telephone and written communications between them relative to the Blackwell and Binder cases.

On March 18, 2005, McGlone forwarded a letter captioned for both Blackwell and Binder to Killeen stating that he had reviewed the Contract and that Killeen could "assume a tender of defense will be forthcoming."  Exhibit P-2.

Rather than sending the actual tender to Killeen, however, on April 7, 2005 McGlone tendered the Blackwell case to Tenn-Tom Towing Company.[4]   In that letter, McGlone stated that pursuant to "Paragraphs 9, entitled 'Insurance' and 12 entitled 'Indemnity', Murphy Oil USA, Inc. hereby tenders its defense and demands complete hold harmless and full indemnity. . . ."  Exhibit P-3.

On April 9, 2005, a telecopy letter from Killeen to McGlone, referencing Blackwell only, referred to a March 24th conversation between the two attorneys.  Killeen acknowledged McGlone's position that Mid-Stream owed Murphy a defense and potential indemnification and Killeen stated that "Mid-Stream acknowledges its obligation under the Contract of Affreightment."  Killeen went on to state that "my client will not pay for your continued legal fees and expenses beyond March 24, 2005, in order to mitigate the duplicate cost."  Exhibit P-4.

---

[3]  P-27, April 26, 2005 Binder statement at p. 5.

[4]  The Contract provided that tender of defense and indemnity would be provided to Tenn-Tom's office in Mobile, Alabama.  It is unclear why McGlone did not forward a copy of the tender letter to Killeen.

In response, McGlone, by telecopy letter dated April 12, 2005, wrote to Killeen in Blackwell only and again tendered Murphy's defense and demanded complete indemnity.[5]  Exhibit P-6.  On April 13, 2005, McGlone wrote to Tenn-Tom Towing again, this time tendering the defense and demanding indemnity in the Binder litigation.  Exhibit P-5.  Otherwise, the letter is identical to the earlier letters of April 7th and 12th.

On April 15th, McGlone wrote to Killeen, captioning both Blackwell and Binder, replying to Killeen's letter of April 9th.  McGlone asserted that Killeen's April 9th letter was unclear and asked whether Mid-Stream agreed to defend and "completely indemnify and hold harmless Murphy in the referenced litigation."  Exhibit P-7.

Killeen replied by telecopy to McGlone on April 22nd, captioning only the Blackwell case, stating that "Mid-stream has offered to defend Murphy Oil in this litigation and if a judgment is entered, indemnify Murphy Oil based on its additional assured status."  Exhibit P-8.

On April 25, 2005, by telecopy, McGlone wrote to Killeen referencing both Blackwell and Binder and referring to an e-mail of April 21st.[6]  McGlone quibbled with Killeen's letter of April 9th by stating "[y]our letter does not define those obligations, nor does your letter of April 9th indicate that Mid Stream and its underwriters will defend and indemnify Murphy in the Binder/Blackwell litigations."  McGlone, however, went on to reply to Killeen's letter of April 22nd and indicated that he would send Killeen an agreement regarding Murphy's defense and indemnification and that he

---

[5]  The April 12th letter is an exact copy of the April 7th tender letter to Tenn-Tom Towing except for the addressee.

[6]  No such e-mail has been produced or introduced into evidence.

would, "by separate correspondence, correct the errors in [Killeen's] letter of April 22nd." Exhibit P-9.

Also, on April 25, 2005, McGlone forwarded a letter agreement to Killeen in the Blackwell action in which he required that Tenn-Tom Towing Company, Mid-Stream Fuel Service, Inc. and their underwriters agree to "unqualifiedly, unequivocally, and unconditionally pay any judgment ...." Exhibit P-10.

On April 26th, by telecopy, captioning Blackwell, Killeen forwarded to McGlone a modified agreement in which Mid-Stream, Tenn-Tom Towing and their respective underwriters agreed to "defend, indemnify and hold harmless Murphy . . . in accordance with Section 12 of the attached Contract of Affreightment." Exhibit P-11.

On April 27th, McGlone replied to Killeen, this time referencing Binder, stating that the "language contained in yours of April 26th is too limiting." McGlone again demanded that Killeen's clients "unqualifiedly, unequivocally, and unconditionally defend, indemnify and hold harmless Murphy Oil USA." McGlone provided a signature line for acknowledgment of the terms of his proposed agreement. Exhibit P-12.

On April 27th, Killeen referenced the newly proposed agreement of the same date and stated: "[l]et me be perfectly clear - Martin has agreed to accept Murphy's tender subject to the entirety of the Contract of Affreightment, no more and no less. This is in no way an unqualified defense because the Contract of Affreightment is not unqualified. . . . [P]lease inform me whether you, on behalf of Murphy Oil USA as their agent, accept our acceptance of Murphy's tender of defense and indemnity (if a judgment is rendered) pursuant to the terms and conditions of the Contract of

Affreightment."[7]  Exhibit P-13.

On April 28th, McGlone sent two separate but identical letters to Killeen, one captioned for each case, rejecting Killeen's statement of defense and indemnity and acknowledging that "the words unqualifiedly, unequivocally and unconditionally are problematic for you."  He deleted those words from his proposed agreement but insisted on complete indemnity for all claims asserted by Blackwell and/or Binder.  "Anything less is not acceptable."  Exhibits D-4 and 5.

On May 10, 2005, McGlone, captioning Blackwell and Binder, referred to a communication from Killeen of May 9th.[8]  Exhibit P-14.  McGlone went on to state that he had "asked on several prior occasions that you clarify your statement that your clients 'have agreed to defend and indemnify Murphy Oil USA pursuant to the express terms and conditions of the Contract of Affreightment....'  Please answer one simple question.  Does that language specifically include the claims asserted by Messrs. Blackwell and Binder?"  Id.

On May 10th, Killeen wrote to McGlone by e-mail referencing his March 24th conversation with McGlone and his April 9th letter and stating that he again confirmed that his client agreed to defend Murphy in both cases as required by the terms and conditions of the Contract.  Exhibit P-15.

Finally, on May 19, 2005, in an e-mail from Mike Murley, a representative of Martin, to Pat Heimel, a representative of Murphy Oil, referencing both the Binder and Blackwell cases, Murley confirmed that "Martin agrees to assume the defense and indemnity of Murphy Oil USA in accordance with the written Contract of Affreightment dated April 1, 1997."  Exhibit P-16.  The

---

[7]  Martin is the parent of Mid-Stream.

[8]  There is no May 9, 2005 communication from Killeen to McGlone in the record.

debate was over.

The communications between McGlone and Killeen, spanning from March 18, 2005 to May 10, 2005 were cross talk.  They accomplished nothing and wasted a lot of paper.  It is therefore the undersigned's obligation to make the call on when the acceptance of the tenders was made and therefore any fees incurred by Murphy beyond that time are non-recoverable.

## PRELIMINARY MATTERS

At the trial the parties stipulated that:  (1) the hours expended on the individual tasks described in the billing records submitted by Murphy were reasonably expended; and (2) the billing rates found in the billing records submitted by Murphy were reasonable.  The parties agreed that the time spent by Murphy's counsel on preparing revisions to the Contract should be eliminated.[9]

## ANALYSIS OF ISSUES

First Issue:      By which date should Murphy have tendered the defense of the Binder and Blackwell cases to Mid-Stream?

Mid-Stream argues that McGlone should have tendered the defense of the two cases to Mid-Stream on March 15, 2005, when McGlone received a copy of the Contract or shortly thereafter.  Murphy responds that McGlone had to complete certain steps before making the tender.  These steps included receipt and review of the Contract, request for authority from Murphy to make the tender, receipt of Murphy's response to a recommendation on tender, and preparation of a tender to Mid-Stream.

---

[9] McGlone testified that the time shown for Heather Johnson ("HAJ" in the billing records) should be deleted. Entries for HAJ for revision of the Contract appear only on the Blackwell statement dated April 26, 2005. Exhibit p-28. Those entries are:  March 15 (0.20 hours); March 22 (0.70 hours); March 23 (two entries for 1.40 hours and 1.20 hours); March 24 (1.30 hours); March 28 (0.10 hours); and March 29 (1.90 hours), for a total of 6.80 hours.

On Tuesday, March 15, 2005 McGlone:  (1) conferred by telephone with Heimel, the Murphy claim manager, on tender of the defense; (2) received and reviewed the Contract; and (3) prepared a letter to Heimel recommending the tender.[10]  On Thursday, March 17, 2005, McGlone conferred with Heimel regarding the tender of defense and prepared a letter to Killeen regarding the Contract and the identity of underwriters.[11]  On Friday, March 18, 2005, McGlone sent the letter of that date to Killeen, via regular mail, in which he stated that "[y]ou may assume a tender of the defense will be forthcoming."  P-2.  On Thursday, March 31, 2007, McGlone confirmed by telephone with Heimel that he was authorized to tender the defense.[12]  McGlone tendered the defense in the Blackwell case to Mid-Stream on April 7, 2005 and in the Binder case on April 13, 2005.  Exhibits P-3 and 5.

The court finds that Murphy was able to tender the defense in the Blackwell and Binder cases on March 18, 2005.  All of the information that McGlone and Heimel required to determine whether the Binder and Blackwell cases should be tendered was available to them by March 18, 2007.  At that time, McGlone had been representing Murphy in the two cases for more than a month.  The obligation in the Contract to defend and indemnity is unambiguous.  There was no reason for Murphy to delay until April 7 and 13, 2005 to tender the defenses.

Second Issue:  On March 24, 2005 did Mid-Stream offer to assume Murphy's defense in the two cases and indemnify it?

---

[10]  P-27 - April 26, 2005 Blackwell statement at p. 5.  A copy of the letter from McGlone to Heimel was not introduced into evidence.

[11]  P-27 - April 26, 2005 Blackwell statement at p. 7.

[12]  P-27 - April 26, 2005 Blackwell statement at p. 11.

Mid-Stream contends that, in a telephone conversation between Killeen and McGlone on March 24, 2005, Killeen told McGlone that Mid-Stream would pick up Murphy's defense in the two cases and indemnify it in the event of any judgment against it.  Killeen testified that when he received McGlone's letter of March 18, 2005, he forwarded it to Mike Murley, the Mid-Stream risk manager, who became concerned about the prospect of paying two law firms to represent Murphy. Murley instructed Killeen to report to McGlone that Mid-Stream would pick up the defense. Although Killeen testified that on March 24th he told McGlone that Mid-Stream would pick up Murphy's defense, Killeen did not confirm this in writing nor did he send McGlone motions to enroll as counsel in the two cases.  Killeen did not refer to the March 24 telephone conversation until his letter of April 9, 2005.  Exhibit P-4.  McGlone disputes Killeen's  account of the March 24 telephone conversation.  He testified that if Killeen had told him that Mid-Stream would pick up Murphy's defense, he would have immediately confirmed the conversation in writing and sent Killeen a motion to enroll as counsel.

There is no dispute that a telephone conversation occurred on March 24th.[13]  Killeen's testimony that Murley was concerned about paying for two lawyers is credible.  McGlone's testimony about confirming such a conversation is also credible.  Mid-Stream has not demonstrated by a preponderance of the evidence that on March 24, 2005 it offered to take over the defense of Murphy in the two actions and indemnify it in the event of a judgment.

Third Issue:      Did Murphy request more from Mid-Stream than it was obligated to provide under the  Contract?

---

[13]  The Lemle billing records refer to a telephone conversation on that date between McGlone and Killeen concerning the filing of a third party complaint by Murphy.  Exhibit P-27.  April 26, 2005 Binder statement at p. 9.

The obligations at issue are found in the Contract.  Pursuant to paragraph 9(b) of the Contract, Mid-Stream agreed to procure, pay for and maintain in force Protection and Indemnity or marine liability insurance, naming Murphy as an additional assured with waivers of subrogation in its favor on the towing vessel and the barges.  Pursuant to paragraph 12 of the Contract, subject to the insurance provisions, Mid-Stream agreed to indemnify, defend and save harmless Murphy of and from all claims, charges and expenses, including reasonable attorney's fees, for damages to third parties arising from injuries to any person caused by negligence on the part of Mid-Stream in the performance of its obligations under the Contract.  Exhibit P-1 at pp. 7 and 10.

Murphy could demand that Mid-Stream perform its obligations under paragraphs 9 and 12 of the Contract and, if Mid-Stream failed to perform, then Murphy could resort to legal action to enforce the Contract.

Murphy's first tender in either case was made in Blackwell on April 7, 2007.  Exhibit P-3. While the second full paragraph on page two of that letter refers to provisions of paragraphs 9 and 12, the first paragraph states, "Murphy Oil USA, Inc. hereby tenders its defense and demands complete hold harmless and full indemnity from Mid Stream . . . for the claims asserted by Mr. Blackwell . . . ." Exhibit P-3 (Emphasis added).  Whatever "complete" and "full" mean, they are not found in paragraphs 9 and 12 of the Contract.  The language found in the April 7, 2007 letter also appears in the letters of April 12 and 13, 2005.  Exhibits P-5 and 6.  In the letter of April 15, 2005 McGlone asks if Mid Stream is, "agreeing to defend and completely indemnify and hold harmless Murphy. . . ."  Exhibit P-7(Emphasis added).  In McGlone's letters of April 25 and 27, 2005 he requests that Mid-Stream, "agree to unqualifiedly, unequivocally and unconditionally defend,

indemnify and hold harmless Murphy. . . ."  Exhibit P-10 and 12 (Emphasis added).  Although McGlone's letter of April 28, 2005, withdrew "unqualifiedly, unequivocally and unconditionally," the letter persists in demanding that Mid-Stream "<u>completely</u> indemnify Murphy. . . ."  Exhibit D-3 (Emphasis added).  These modifiers were not required.

Most significantly, they do not appear in the May 19, 2005 e-mail exchanged between Heimel and Murley which simply states that "Martin agrees to assume the defense and indemnity of Murphy Oil USA in accordance with the written Contract of Affreightment dated April 1, 1997." Exhibit P-16.

Murphy first tendered the defense of the Blackwell case on April 7, 2007.  P-3.  The first tender of the defense in the Binder case was on April 13, 2007.  P-5.  It made those tenders and repeated variations of them on April 22, 25, 27 and 28, each time seeking more from Mid-Stream than it was obligated to provide under the terms of the Contract.  The May 19, 2005 e-mail demonstrates that Mid-Stream never agreed to assume the defense of the cases on the terms sought by McGlone.

<u>Fourth Issue</u>:   Did Mid-Stream on April 9, 2005, agree to defend and indemnify Murphy in the Blackwell litigation as required by the Contract?

On April 9, 2005, Killeen sent a telecopy letter to McGlone, referencing only the Blackwell case.  Killeen referred to their March 24, 2005 telephone conversation and stated, "Mid-Stream acknowledges its obligation under the Contract of Affreightment." Exhibit P-4.  Mid-Stream argues that it accepted the defense of the Blackwell case on April 9th.  This is disputed by Murphy.

The April 9, 2005 letter, read in its entirety, was an acceptance of the defense in the

13

Blackwell case.  The first sentence of the letter refers to McGlone's statement on March 24, 2005 that Mid-Stream owed Murphy a defense and indemnity.   The second sentence is an acknowledgment of Mid-Stream's obligation under the Contract.   The third sentence provides further confirmation that Mid-Stream acknowledged its obligations to defend.  It states, "[a]lthough I would like to see you [McGlone] remain in this litigation, my client will not pay for your legal fees and expenses beyond March 24... ."  Id.  As previously noted, Mid-Stream's concern over paying for two attorneys rings true.  Mid-Stream, however, could only eliminate the duplicate attorneys' fees if it assumed Murphy's defense.

But for Murphy's insistence on more than Mid-Stream owed under the Contract, the parties should have been able substitute counsel in the Blackwell case within a few days of Killeen's  April 9th letter.  Since the letter only applies to the Blackwell case, a similar writing is required in the Binder case.

Fifth Issue:       When did Mid-Stream accept Murphy's tender of the Binder action?

On May 10, 2005, Killeen e-mailed McGlone and referenced both the Blackwell and Binder cases:

> As a follow-up to our March 24th conversation, my April 9th letter and all follow-up letters, this again confirms that Martin agrees to defend Murphy Oil as required by the terms and conditions of the contract.  At this time, we are unaware of any exposure to Murphy.  However, in the event we become aware of exposure, we will notify Murphy.

Exhibit P-15.  This is the first time that Killeen refers to the Binder case and states in writing that Mid-Stream would defend Murphy in that case.  Mid-Stream accepted Murphy's defense of the Binder case on May 10, 2005.

<u>Sixth Issue</u>:    What is the cut-off date for the fees and expenses of Murphy's counsel in the Blackwell case?

Mid-Stream agreed to defend and indemnify Murphy in the Blackwell action in the April 9th letter from Killeen to McGlone.  This occurred within three days of the first tender of the defense of the Blackwell action.  April 9th, however, is not the cut-off date for fees and expenses.  It must be moved forward to account for the fact that Murphy should have tendered the defense of the Blackwell action to Mid-Stream by March 18th.

If Murphy had tendered the defense of the Blackwell case on Friday, March 18, 2005, Mid-Stream would have agreed to defend and indemnify Murphy within three working days or by Wednesday, March 23, 2005.  Killeen could have been substituted as counsel for Murphy by no later than Friday, March 25, 2005.  The cut-off date for the fees and expenses of Murphy's counsel in the Blackwell case is Friday, March 25, 2005.

<u>Seventh Issue</u>:    What is the cut-off date for the fees and expenses of Murphy's counsel in the Binder case?

Mid-Stream did not accept Murphy's defense of the Binder case until May 10, 2005, when Killeen e-mailed McGlone referencing the Binder case and confirming that agreement to defend Murphy as required by the terms and conditions of the Contract.  This occurred about a month after Murphy first tendered the defense in the Binder action on April 13th.  However, May 10th is not the cut-off date since it too must be moved forward to account for the fact that Murphy should have tendered the defense of the Binder action to Mid-Stream by March 18th.

If Murphy had tendered the defense of the Binder case on Friday, March 18, 2005, Mid-Stream would have accepted the defense about a month later or by April 18th.  Murphy is not entitled

to recover any fees or expenses incurred in the Blackwell action after April 18th.[14]

<u>Eighth Issue</u>.   Should Murphy have moved for summary judgment?

Mid-Stream argues that, pursuant to <u>Hensley v Eckerhart</u>, 461 U.S. 424, 103 S.Ct. 1933 (1983), the court must consider the number of hours reasonably expended on the litigation.  Hours that were not reasonably expended are excluded from the lodestar calculation described in <u>Johnson v. Georgia Highway Express</u>, 488 F.2d 714 (5th Cir. 1974).  Mid-Stream contends that, pursuant to <u>Smith v. Tenneco</u>, 803 F.2d 1386 (5th Cir. 1986), attorney's fees incurred after a motion for summary judgment should have been filed are <u>per se</u> unreasonable.[15]

At the trial McGlone testified that before Murphy could move for summary judgment, he needed to re-depose Captain Binder to determine if there were any allegations that the barge was improperly loaded at the Murphy dock at Meraux.  This issue was not raised in Binder's first deposition and was critical to filing a motion for summary judgment on behalf of Murphy.  Binder's second deposition was on May 19, 2005[16] and Murphy was not required to seek a motion for summary judgment prior to that date.  Mid-Stream's obligation to defend, indemnify and hold Murphy harmless was not reduced or eliminated because of the summary judgment issue.

---

[14]  It could be argued that if Murphy had tendered the defenses in both cases on March 18, Killeen, on behalf of Mid-Stream, would have agreed to defend and enroll in both cases by March 25, 2005.  The discussion of the communications between counsel demonstrates that Killeen is responsible for the month long delay in agreeing to defend Murphy in the Binder case.

[15]  Mid-Stream overstates the holding in <u>Smith v. Tenneco</u>.  The district court limited the obligation of the vessel owner to indemnify Tenneco to the fees incurred by Tenneco prior to the time that it determined Tenneco could have moved for summary judgment.  The Fifth Circuit did not reach this issue because it determined that the indemnity provision in the charter agreement did not apply to the negligent operation of a crane on Tenneco's platform.

[16]  Exhibit P-28 Blackwell June 14, 2005 statement at p. 15.  <u>See</u> also Judge Fallon's comments at p. 14 of the transcript of the hearing on Murphy's motion for summary judgment in this matter.  Exhibit D-6.

<u>Ninth Issue</u>:     What law applies to the Contract and Murphy's claim for indemnity?

The Contract is silent on the applicable law.  It provides for notices and invoices to Murphy in Arkansas and notices and payments to Mid-Stream in Alabama.  It calls for shipments from Murphy in Meraux, Louisiana or Chevron in Pascagoula, Mississippi, to Freeport or St. Marks, Florida.  It provides for any General Average statements to be prepared in New Orleans.

Louisiana employs the interest analysis theory in determining which state has the greatest interest in the litigation and what law should be applied to the contract.  <u>Jagers v. Royal Indemnity Company</u>, 276 So.2d 309 (La. 1973); and <u>Kirby v. Kirby</u>, 579 So.2d 508 (La. App. 4th Cir. 1991).  In the absence of an effective choice of law by the parties, the following are considered:  (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; and (4) the location of the subject matter of the contract; and (5) the domicile of the parties.  These factors are evaluated according to their relative importance with respect to the particular issue.  <u>See Kirby</u>, 579 So.2d  at 513 (citing Restatement, Second, Conflict of Law, Section 188).[17]

There is no evidence on the place where Murphy and Mid-Stream contracted or where they negotiated the contract.  These factors cannot be considered.  The contract provided for performance in Louisiana, Mississippi and Florida.  Although the cargo at issue was loaded in Meraux, there is no evidence that Louisiana was the dominant place of performance.  The subject matter of the contract was the loading, transportation and delivery of petroleum products.  This occurred in the three states already mentioned and in Alabama since it was necessary to traverse the Alabama inter-

---

[17]  It is noted that the mere fact that the plaintiffs filed their action against Mid-Stream in Louisiana is not a factor.

coastal waters to move the product from Louisiana and Mississippi to Florida.  The accident that gave rise to the claim for indemnity occurred in Alabama.  Murphy was domiciled in Arkansas and Mid-Stream in Alabama.  Louisiana's only contact was the loading of the cargo at the Meraux refinery and the preparation of statements in New Orleans.  Louisiana does not have the most significant relationship to the issue in litigation.  Louisiana law does not apply to the Contract.

Because Louisiana law does not apply to the Contract, it is not necessary to consider the following issues:  (1) whether American, as Murphy's insurer, is liable for penalties and attorney's fees incurred pursuant to La. R.S. 22:658 and 22:1220; and (2) whether the plaintiffs are liable to Murphy for attorney's fees for prosecution of its claim for attorneys' fees incurred in the two cases pursuant to the Louisiana open account statute, La. R.S. 9:2781(A).

Tenth Issue:    Is Murphy entitled to reimbursement of the attorney's fees and costs incurred by it prior to the time that it should have tendered the defense of the cases to Mid-Stream?

Mid-Stream argues that it cannot be compelled to reimburse Murphy for attorney's fees and costs incurred by Murphy prior to a demand for defense and indemnity.  It concedes that the issue is "debatable."  See Rec. doc. 44 (Mid-Stream pretrial memorandum) at p. 7, n.27.  Mid-Stream cites Ingalls Shipbuilding v. Federal Insurance Co., 410 F.3d 214 (5th Cir. 2005).  In response to the insurer's contention that under Texas law the duty to defend was triggered only by actual service of process on the insured followed by the transmission of that service to the insurer, the Fifth Circuit found that "[t]he Texas Supreme Court, however, has expressly left open the question whether the duty to defend is triggered when the insurer has actual knowledge of a suit against the insured."  Id. at 233.

Even if the rule urged by the insurer in <u>Ingalls Shipbuilding</u> were applicable to Murphy's claim under paragraph 12 of the Contract, the Texas Supreme Court left open the question of whether the duty to defend is triggered when the insurer has actual knowledge of a suit against the insured.  Killeen knew that Murphy was added to the proceedings when Binder and Blackwell filed their amended complaints.  In these circumstances, and pursuant paragraph 12 of the Contract, Mid-Stream is liable to Murphy for reimbursement of the attorney's fees and costs incurred by Murphy prior to the time that it should have tendered the defense and indemnity of the cases on March 18, 2005.

<u>Eleventh Issue</u>:        What is the quantum owed by Mid-Stream to Murphy?

Based on the foregoing, Mid-Stream is required to reimburse Murphy for a portion of the fees and expenses incurred by Murphy in both the Blackwell and Binder cases.  The fees are owed in the Blackwell case from the inception of Lemle's representation of Murphy through March 25, 2005.  In the Binder case the period is from the inception of Lemle's representation of Murphy through April 18, 2005.

1.        Calculation for the Blackwell case.

Lemle began representing Murphy in the Blackwell case on February 7, 2005.  On March 28, 2005, Lemle issued a statement to Murphy's insurer for the services rendered and costs incurred in the Blackwell case through February 28, 2007 in the amount of $3,452.87.  Exhibit P-28.  Murphy is entitled to reimbursement of all of the charges on March 28, 2005 invoice.

On April 26, 2005, Lemle issued a statement in the Blackwell case through March 31, 2005 in the amount of $15,263.28.  Exhibit P-28.  The charges for March 26 through 31 ($3,439.00 in fees

and $71.15 in costs)  must be removed.  The charges for HAJ for revision of the Contract entered

from March 15 through March 25, also must be removed.  The net amount that Mid-Stream must

reimburse Murphy on the April 26, 2005 statement is $10,793.13.

The total amount Murphy is entitled to on the Blackwell case is $14,246.00.

2.      Calculation for the Binder case.

Lemle began representing Murphy in the Binder case on February 16, 2005.  On March 28,

2005, Lemle issued a statement in the Blackwell case through February 28, 2007 in the amount of

$2,230.45.  Exhibit P-27.  Murphy is entitled to reimbursement of all of these charges.

On April 26, 2005, Lemle issued a statement in the Binder case through March 31, 2005 in

the amount of $11,625.61.  Exhibit P-27.  Murphy is entitled to reimbursement of all of these

charges.

On June 14, 2005, Lemle issued a statement in the Binder case through June 14, 2005 in the

amount of $8,555.00.  Exhibit P-27.  Murphy is entitled to reimbursement of the charges for April

1-18, 2005.  The fees for April 1-18 were $2,123.50 and costs for that period were $262.00.  The

total to be reimbursed from the June 14, 2005 statement is $2,385.50.

3.      Calculation of total for Blackwell and Binder cases.

The total amount be reimbursed Murphy for both cases is $30,487.56 ($14,246.00 on the

Blackwell case plus $16,241.56 on the Binder case).

<u>RECOMMENDATION</u>

IT IS RECOMMENDED that:

1.      On American Club's complaint for declaratory judgment, the amount of the reasonable and

        necessary fees and costs that Mid-Stream and American Club are obligated to pay Murphy,

pursuant to the Contract of Affreighment, is $30,487.56.

2.      On Murphy's counterclaim and third party demand, there be judgment in favor of Murphy
and against Mid-Stream and American Club in the amount of $30,487.56 plus interest from
the date of the filing of the counterclaim and third party demand on February 7, 2006; and
judgment against Murphy on all other relief sought by it in its counterclaim and third party
demand.

3.      Each party shall bear its own costs.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions, and
recommendation in a magistrate judge's report and recommendation within 10 days after being
served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal
the unobjected-to proposed factual findings and legal conclusions accepted by the district court,
provided that the party has been served with notice that such consequences will result from a failure
to object.  Douglass v. USAA, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 3rd day of August, 2007.

_____
**SALLY SHUSHAN**
**United States Magistrate Judge**